**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

|  |  |
|---|---|
| PROSYNC TECHNOLOGY GROUP, LLC )<br>5521 Research Park Dr., Ste. 185 )<br>Catonsville, MD 21228 )<br> )<br>                Plaintiff, )<br>        v.                            )<br> )<br>TIM MILLER, )<br>113 Bonnie View Rd, )<br>Glen Burnie, MD 21060 )<br> )<br>                Defendant. )<br>                                    ) | Civil Action No. _____ |

## COMPLAINT

Plaintiff ProSync Technology Group, LLC ("ProSync"), through undersigned counsel, brings this Complaint against Defendant Tim Miller, for injunctive relief and alleges as follows:

## INTRODUCTION

1.      ProSync brings this Complaint seeking necessary injunctive relief to protect ProSync's confidential and proprietary information and business relationships which Miller is using for the benefit of ProSync's direct competitor to compete with ProSync in breach of federal law, his Agreement with ProSync, and his duty of loyalty to ProSync.

2.      For over 5 years, ProSync employed Miller as its Chief Revenue Officer, a highly compensated position. In return for his employment, compensation, and access to ProSync's resources, confidential information, and training, Miller entered into a Confidentiality, Non-Competition, and Non-Solicitation Agreement ("Agreement") in which he agreed not to compete against ProSync for a period of six months after his employment.

3.      Miller violated this obligation by resigning from ProSync and then quickly joining one of ProSync's direct competitors, ODME Solutions, LLC ("ODME"). Miller is seeking to help

ODME secure the same business development opportunities and contracts that Miller led while ProSync's Chief Revenue Officer in direct competition with ProSync.

4. Miller's conduct is also a breach the non-solicitation restrictions in the Agreement. For example, as part of Miller's efforts to solicit a business opportunity known as "Integrated Product Support Services" or "IPSS," Miller caused a ProSync business partner, ORBIS, to cancel its teaming agreement with ProSync and sign a similar agreement with ODME. ProSync is aware of this because ORBIS mistakenly emailed Miller's former ProSync address about its agreement with ODME after backing out of its agreement with ProSync.

5. ProSync has investigated, and continues to investigate, Miller's conduct prior to his departure and has discovered that Miller misappropriated ProSync trade secrets and Confidential Information.

6. For example, since Mr. Miller's resignation, ProSync has been unable to locate or access multiple files and documents reflecting ProSync's business development strategies and active capture opportunities for which Miller was responsible. ProSync's information technology personnel determined that these files do not appear on ProSync's systems and cannot be located, as Miller either failed to retain them on and/or deleted them from ProSync's servers.

7. As a result of this and other unlawful conduct, ProSync has suffered and will continue to suffer further irreparable harm without the injunctive relief it seeks to prohibit Miller's further misappropriation of ProSync's proprietary and confidential information and violation of his Agreement.

## PARTIES, JURISDICTION, AND VENUE

8. ProSync is duly organized and existing under the laws of the State of Maryland, having its principal place of business co-located in Baltimore County, Maryland.

9.  Tim Miller is a natural person and former employee of ProSync. Miller currently, and at all relevant times, resides in Maryland. Miller consented to this Court's jurisdiction in his July 1, 2020 Agreement with ProSync, out of which this dispute arises.

10.  This Court has jurisdiction under 28 U.S.C. § 1331 because this action includes claims arising under federal law, specifically the Defend Trade Secrets Act or 2016, 18 U.S.C. § 1831, *et seq.*, and because all supplemental state law claims arise out of the same case or controversy and derive from a common nucleus of operative facts as the federal claim over which this Court has original jurisdiction.

11.  Venue is proper in this District under 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

12.  Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Miller expressly consented to the jurisdiction in the courts of the State of Maryland or in the United States District Court for the District of Maryland.

13.  Per the Agreement, Miller agreed that:

> **[§ 21]** This Agreement shall be governed by, and construed in accordance with, the internal law of Maryland, without giving effect to conflict of law principles.
> **…**
> **[§ 26(b)]** Notwithstanding the terms of Section 26(a) above, Employer shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction in order to enforce Employer's rights and remedies under Section 7, Section 8, and/or Section 9 above.

### FACTS

#### ProSync's Business

14.  ProSync Technology Group, LLC ("ProSync") is an established Service-Disabled Veteran-Owned Small Business (SDVOSB) technology services and solutions company that has operated for more than 25 years and provides mission-focused support to customers across the

3

United States.

15.    ProSync delivers professional and technical services in support of complex customer missions to the Department of Defense (DoD) and Intelligence Community (IC) agencies, including systems engineering, software development, cybersecurity, program management, and related technology solutions.

16.    ProSync's business model centers on deploying skilled professionals to support customer programs, with a significant portion of its workforce holding high-level security clearances and operating in highly regulated environments.

17.    ProSync supports its customers by assembling and sustaining high-performing teams capable of delivering technical expertise, operational support, and mission execution at the speed required by customer needs.

18.    ProSync emphasizes recruiting, developing, and retaining qualified personnel and invests in talent acquisition and workforce development as a core component of its business operations.

19.    ProSync utilizes structured program management practices, agile engineering processes, and quality management methodologies to deliver consistent and measurable results for its customers.

20.    ProSync's customers engage the company to obtain professional services and technical support tailored to specific mission, operational, or programmatic requirements.

21.    In support of customer engagements, ProSync identifies and assigns professionals with skills, experience, and qualifications aligned to defined technical and operational needs.

22.    ProSync's personnel support customer programs across a variety of locations and operational settings, including land-, sea-, air-, space-, and cyber-related environments.

23.     ProSync maintains a nationwide operational footprint and provides services to customers at multiple sites across the United States, currently supporting DoD and IC agencies at posts, camps, and stations in multiple states, including Maryland, Virginia, Florida, New Mexico, California, and Hawaii.

**Miller's Employment and Agreements with ProSync**

24.     On or about July 1, 2020, ProSync hired Tim Miller as Chief Revenue Officer.

25.     As a precondition and in consideration for his employment with ProSync, Miller signed the Agreement with ProSync.

26.     In the Agreement, Miller acknowledged and agreed that his offer of employment with ProSync, together with any and all monetary, financial, or other substantive benefits derived from his employment, and other good and valuable consideration, constituted adequate and sufficient consideration for his obligations, promises, and covenants under the Agreement.

27.     Section 7 of the Agreement provides that Miller's employment created a relationship of confidence and trust with respect to ProSync's proprietary information. Under that provision, Miller agreed that he would not, either during his employment or after its termination, directly or indirectly disclose any proprietary information to any third party or use such information for his own benefit or for the benefit of any person or entity other than ProSync. Miller further agreed to take all necessary precautions to prevent the loss, misuse, or disclosure of any documents or information containing or relating to ProSync's proprietary information.

28.     Section 8 of the Agreement, titled "Restrictions on Competition," imposed post-employment obligations prohibiting Miller from performing services that were substantially similar to the services he provided to ProSync for any person or entity engaged in ProSync's business for a limited period of six months after his employment with ProSync.

29.    Section 9 of the Agreement, titled "Non-Solicitation," prohibited Miller, for a period of six months after his employment, from soliciting, encouraging, or inducing—or attempting to solicit, encourage, or induce—any client, customer, contractor, subcontractor, or other entity with whom ProSync had a contractual business relationship within the one-year period preceding the termination of his employment.

30.    These restrictive covenants were narrowly tailored in both geographic scope and duration. The Agreement limited the restrictions to a defined "Restricted Area," consisting of Arizona, Pennsylvania, Maryland, Virginia, and Washington, D.C., and to a "Restricted Period" of six (6) months following the termination of Miller's employment. The Agreement tolls this six-month period for the length of period of time in which Miller is in violation of these provisions.

### Miller's Access to Proprietary Company Information

31.    During his tenure at ProSync, Miller served as Chief Revenue Officer in a role that provided him access to ProSync confidential business information, including propriety databases, customer contacts, pricing models, and strategic operating plans, information that ProSync maintains as trade secrets and protects from disclosure.

32.    During his tenure at ProSync, Miller was provided with and utilized access to each of ProSync's nerve center administrative and operations support services in order to undertake sales and recruiting activity which was the primary subject matter of his role with ProSync.

33.    In particular, during his employment at ProSync, Miller was key to ProSync's long-term business strategy focused on capturing and/or maintaining the following business opportunities ("Business Opportunities"):

| Type | Customer | Program |
|------|----------|---------|
| Capture | NSWC IHD | INTEGRATED COMMAND MODERNIZATION SUPPORT SERVICES |

| | | |
|---|---|---|
| Capture | NSWC Keyport | Infrastructure & Security Support Services |
| Capture | NSWC PHD | Enterprise Security Services |
| Capture | NSWC PHD | Self Defense Test Ship |
| Capture | NSWC PHD | Integrated Product Support Services ("IPSS") |
| Capture | NSWC PHD | Integrated Combat System Engineering |
| Capture | NSWC PHD | Specialized Characterization and Analyzation Lab Effort |
| Capture | PEO IWS | Cyber Platform and Systems Program Management Advisory & Assistance Services |
| Capture | NAVAIR | Security Services for F-35 |

34.    ProSync made substantial efforts to maintain the secrecy of its confidential information, including but not limited to requiring employees to enter into agreements that prohibit the disclosure and misuse of that information, use of computer security passwords and firewalls to protect its computer databases, use of appropriate physical security, limiting access to trade secret and confidential information to those within ProSync who have a need to access the information in connection with the performance of their job duties, among other things.

35.    After Miller's resignation, ProSync has been unable to locate or access multiple files and documents reflecting key business development strategies and information relating to the Business Opportunities. All of these files and related information was in Miller's possession and control as Chief Revenue Officer.

36.    Based on investigation by ProSync's IT and forensic investigation teams, these files do not currently exist on ProSync's systems and cannot be found. Miller either did not properly maintain these files on ProSync's servers as required by company policy or deleted them from the ProSync system.

37.    These files should have contained information relating to the Business Opportunities, such as internal pricing data, confidential information about customer relationships, candidate pipelines, and capture strategies. This information is essential to ProSync's business

strategy to capture the Business Opportunities. ProSync employed Miller to develop this information; the information belongs to ProSync. Yet Miller's conduct has denied ProSync access to its proprietary and crucial business information while Miller competes with ProSync on behalf of PDME for these same opportunities.

38.     Based on this same investigation, ProSync has determined that Miller accessed and downloaded a large number of files shortly before leaving ProSync to work for ODME. ProSync is unable to locate these files as a result of Miller's conduct and therefore is presently unable to determine exactly what information was taken by Miller. However, there is no doubt that this information relates to ProSync's business and was intended by Miller to be valuable to him and ODME. Miller now competes against ProSync at ODME using this information.

39.     Miller's actions were taken surreptitiously, in direct violation of ProSync's confidentiality obligations and policies, and demonstrate Miller's intent to retain and use ProSync's confidential and trade secret information for purposes unrelated to his employment with ProSync and to the advantage and enrichment of his new employer.

### Miller's Resignation from ProSync

40.     On or about January 23, 2026, Miller notified ProSync leadership that he would be voluntarily resigning from his employment, effective the same day.

41.     In the period immediately preceding his resignation, Miller was working with or otherwise engaged in activities on behalf of ODME, a direct competitor of ProSync.

42.     On January 10, 2026, 13 days prior to his resignation, Miller traveled to Melbourne, Florida with Keisha Miller, ProSync's then Human Resources Lead.

43.     In advance of the trip, Keisha Miller spoke with ProSync's staff accountant Brenda Murphy and described the trip as relating to a "career opportunity."

8

44.    ODME is headquartered at 8475 South Tropical Trail, Merritt Island, Florida 32952, approximately 12 miles from the Melbourne airport.

45.    At the time of this trip, Miller remained employed by ProSync in a senior executive role and had not disclosed any intention to resign or pursue employment with a competitor. If Miller had disclosed his intentions, ProSync would not have continued to give him access to its confidential information and trade secrets.

### Miller's Employment with ODME

46.    Immediately, or shortly after his resignation, Miller began employment with ODME, operating in the same industry and market segment and seeking to expand its federal sales business by competing with ProSync for the Business Opportunities.

47.    Like ProSync, ODME is a staffing and human capital solutions firm that specializes in identifying, recruiting, and developing highly skilled professionals to meet customer needs.

48.    Like ProSync, ODME operates within software engineering, cybersecurity, and related technical sectors, providing consultants and project specialists to support mission-critical initiatives.

49.    Like ProSync, ODME's business model centers on responding to customer requests for personnel with defined skills and qualifications. ODME leverages its recruiting network to identify suitable candidates, evaluates those candidates against customer criteria, and assigns them to customer engagements on a contingent or consulting basis. As with ProSync, customers may also engage ODME to convert consultants to direct hires.

50.    Like ProSync, ODME maintains a national presence, serving customers across multiple industries.

51.    Miller's employment with ODME commenced shortly after his resignation from

ProSync. Miller now serves in an Executive Vice President role at ODME that is substantially similar to his Chief Revenue Officer role at ProSync, and includes, but is not limited to, identifying, soliciting, and managing relationships with customers seeking staffing and technical-consulting services.

52.     In violation of the Agreement, Miller is "employed by" an "entity that is engaging in competitive activity with ProSync." Specifically, Miller is "performing services that are the same or substantially similar to the services provided by [ProSync] to any client or customer during the preceding twelve (12) month period, and any prospective client or customer of which Miller actual knowledge and to which [ProSync] has made or has taken specific action to make a proposal within the preceding twelve (12) month period."

53.     Miller's acceptance of employment with ODME less than thirty (30) days of his departure from ProSync falls squarely within the six (6) month restrictive period set forth in the Agreement and constitutes a direct violation of the Agreement.

**Miller's Solicitation of ProSync's Subcontractor for ODME**

54.     During Miller's ProSync employment, Orbis Sibro, Inc. ("ORBIS") agreed to be a subcontractor and teaming partner with ProSync on one of the Business Opportunities managed by Miller, the IPSS contract.

55.     On February 4, 2026, less than two weeks after Miller's resignation, ORBIS Vice President John Markowicz emailed ProSync COO Gabriel Fulton to rescind an already executed Teaming Agreement for the IPSS contract, stating only that "[they] won't make a good partner as a sub for this [IPSS] opportunity."

56.     After conducting an internal investigation, ProSync discovered a February 18, 2026 email from Markowicz to Miller. This email was apparently intended for Miller at ODME but was

mistakenly sent to Miller's former ProSync email address. The email included a fully executed Teaming Agreement between ODME and ORBIS for the IPSS contract with the message:

Tim,

Thanks for this. Should I mark it up with the workshare we discussed or do we need to talk?

John

57.     The timing and content of these communications demonstrates that Miller solicited ORBIS on behalf of ODME, thereby inducing ORBIS to withdraw from its Teaming Agreement with ProSync to pursue the same opportunity with ODME. ORBIS's abrupt February 4 reversal followed by its February 18 email with an executed Teaming Agreement with ODME and message reflecting prior substantive discussions with Miller regarding workshare, evidences that Miller leveraged ProSync's confidential business relationships and goodwill to divert ORBIS and the IPSS opportunity away from ProSync for ODME's benefit, in direct violation of the Agreement and common-law obligations.

### Miller's Solicitation of Independent Contractor Philip Dominguez

58.     During Miller's employment, ProSync engaged Philip Dominguez as an independent contractor to help secure the IPSS opportunity.

59.     After Miller's resignation, Dominguez refused to continue working with ProSync on the IPSS opportunity and has refused to even respond to ProSync despite his contract to work on this Business Opportunity.

60.     This is another example of Miller's interference with ProSync's relations and is a direct and material breach of the non-solicitation provision in the Agreement.

### Miller's Breach of Contract and Misuse of Confidential Information

61.     Miller further violated the restrictive covenants in the Agreement by using ProSync's confidential information and goodwill to advance ODME's business interests.

62.     Miller has retained proprietary ProSync materials and used them for ODME's benefit to assist in competing for business relationships cultivated by ProSync.

### Resulting Harm to ProSync

63.     As a direct and proximate result of Miller's actions, ProSync has suffered and continues to suffer harm, including loss of goodwill, competitive disadvantage, lost economic opportunities, and the misappropriation of its confidential business information.

64.     Specifically, ORBIS' withdrawal had an immediate and material impact on ProSync's ability to pursue the IPSS opportunity. Because of ORBIS' unique obsolescence capabilities, ProSync was left with few viable alternatives so close to the April 17, 2026 proposal submission deadline. As a result, ProSync was forced to proceed with the IPSS bid without ORBIS' support, placing ProSync at a significant competitive disadvantage and jeopardizing its prospects for this opportunity.

65.     Miller continues to compete with ProSync, solicit the Business Opportunities on which he worked for ProSync, and use ProSync's confidential information to harm ProSync for ODME's benefit.

### FIRST CAUSE OF ACTION
### (Breach of Contract)

66.     The allegations contained in the previous paragraphs are repeated, realleged and reasserted as if fully set forth verbatim herein.

67.     The Agreement constitutes a valid, enforceable, and binding contract between Miller and the ProSync.

68.     In exchange for agreeing to the reasonably tailored restrictive covenants Miller accepted employment with ProSync and received substantial compensation from ProSync, access to ProSync's trade secrets and other confidential information, and was entrusted with ProSync's

customer and employee relationships and goodwill.

69.     Miller, in engaging in the conduct described above, breached his obligations under the Agreement, including but not limited to Sections 7, 8, and 9, relating to confidential information, non-competition, and non-solicitation respectively.

70.     As a direct and proximate result of Miller's breach, ProSync has suffered, and will continue to suffer, damages, including but not limited to lost revenue and profits, lost business opportunities and future profits and revenue, lost goodwill, and the value of misappropriated confidential information.

71.     The damages and losses ProSync has suffered because of Miller's breach of the Agreement has, and will continue to, cause irreparable harm to ProSync's business.

72.     The balancing of equities in ProSync holding Miller to his contractual obligations outweigh Miller's interest in breaching those obligations.

73.     Miller's breach of his enforceable contract is against public policy.

## SECOND CAUSE OF ACTION
### (Maryland Uniform Trade Secrets Act, Md. Code, Com. Law §§ 11-1201, *et seq.*)

74.     The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

75.     As described above, ProSync is the owner of valuable trade secrets within the meaning of the Maryland Uniform Trade Secrets Act that it has developed through its efforts and investments in relationships with customers.

76.     As revealed in ProSync's internal forensic investigation, Miller improperly accessed, downloaded, and retained a significant amount of ProSync information in the weeks preceding his resignation, including ProSync's sensitive confidential and proprietary information that is now being used by Miller to compete with ProSync.

77. Upon information and believe, such information includes, among other things: (i) confidential client contacts, pricing data, and capture strategies; (ii) non-public information concerning customer needs, teaming arrangements, and ongoing contract terms; (iii) candidate pipelines and recruiting intelligence developed through ProSync's substantial investment of time and resources; (iv) internal human-resources and personnel information; and (v) clearance and credentialing information for key personnel supporting classified and sensitive government programs.

78. Each of these trade secrets was confidential and commercially valuable at the time of the misappropriation because they gave ProSync a competitive advantage in the market by virtue of not being public. If a competing company obtained this information, that company would be at a competitive advantage over ProSync because they could target ProSync's customers and undercut ProSync's sales using information that would not otherwise be available to the public.

79. Each of ProSync's trade secrets described above derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use.

80. In addition, Miller's exploitation of ProSync's confidential data damages ProSync's years of expensive investment in its business, which permitted ProSync to build the database of customers and customer contacts it currently enjoys.

81. Upon information and belief, Miller knew or should have known that the trade secrets at issue were in fact, trade secrets.

82. Each of ProSync's trade secrets described above is the subject of efforts by ProSync that are reasonable under the circumstances to maintain secrecy.

83.     Miller acquired and is using ProSync's trade secrets outside the scope of authority or consent provided to him by ProSync in connection with his employment.

**84.**     Unless Miller is enjoined from using or disclosing ProSync's trade secrets, ProSync will suffer immediate and irreparable injury, including, but not limited to, the irreversible loss of its confidential and trade secret information, its competitive position and advantage in the marketplace, and associated harm to its market share, reputation, and goodwill.

**THIRD CAUSE OF ACTION**

**(Trade Secret Misappropriation Under the Defend Trade Secrets Act,**

**18 U.S.C. §§ 1831, *et seq.*)**

85.     The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

86.     Miller violated the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1831, *et seq.* (the "DTSA") by misappropriating trade secrets from ProSync for services used in, or intended for use in, interstate or foreign commerce.

87.     Miller possesses ProSync's trade secrets under the DTSA in the form of, at a minimum: customer and teaming partner contact information (including direct contact information for key customer representatives), the types of contracts associated with each customer and teaming partner, the business relationship and financial details of agreements with teaming partners, the identities and compensation for key personnel on contracts and the fact that they intended to be included on future attempts to secure Business Opportunities, and contract expiration or renewal dates for each contract held by each customer and teaming partner.

88.     ProSync's confidential and trade secret information relates to services used in, or intended to be used in, conducting business throughout the United States.

89.     Upon information and belief, Miller is using and will continue to use ProSync's

trade secrets to conduct business.

90.     ProSync invested substantial time and resources to generate such information that Miller misappropriated for himself and ODME. The information contained in the misappropriated materials derives independent economic value by virtue of not being known or available to the public. ProSync has kept this information sufficiently secret to give it a competitive advantage. It has taken affirmative measures to prevent others from acquiring it or using it by means, as described above.

91.     Due to Miller's employment with a direct competitor, and his possession of ProSync's trade secrets and confidential and proprietary information, there is a substantial likelihood that Miller has disclosed or used, and will continue to use, ProSync's trade secrets. In fact, Miller's conduct related to the IPSS opportunity confirms Miller has already done so.

92.     As a direct and proximate result of Miller's unlawful conduct, ProSync has been irreparably damaged, and Miller has been unjustly enriched. This unjust enrichment includes value attributable to the misappropriated information, amounts that Miller saved in costs and development by using the misappropriated information, and increased productivity resulting from the use of the misappropriated information and increased market share.

93.     The exact amount of these damages and unjust enrichment is not presently ascertainable but is believed to be in excess of several hundreds of thousands of dollars and increasing each month.

94.     The acts described above constituted willful and malicious misappropriation in that Miller stole proprietary information and did so with the deliberate intent to injure ProSync's business and improve ODME's business.

95.     As a direct and proximate result of Miller's conduct and through continued use of

ProSync's misappropriated trade secrets, ProSync has suffered and will continue to suffer extensive injury and harm to its business.

## FOURTH CAUSE OF ACTION

### (Breach of Fiduciary Duty/Duty of Loyalty)

96.     The allegations contained in the previous paragraphs are repeated, realleged, and reasserted as if fully set forth verbatim herein.

97.     Miller unquestionably owed ProSync a fiduciary duty of loyalty as ProSync's Chief Revenue Officer, an executive, client-facing position that placed him at the center of ProSync's business-development operations.

98.     Due to his position, Miller was entrusted with access to ProSync's most sensitive confidential and proprietary information, including customer identities and relationships, pricing strategies, capture plans, candidate pipelines, and internal strategic initiatives.

99.     Miller breached that duty through deliberate, dishonest, and disloyal conduct both immediately before and after his resignation.

100.    In the weeks leading to his departure, Miller downloaded numerous ProSync electronically stored files and information, including proprietary and competitively sensitive information.

101.    At the same time, Miller was exploring and positioning himself for employment with a direct competitor while still serving as ProSync's Chief Revenue Officer and without disclosing these activities to ProSync.

102.    Such conduct reflects a knowing misuse of ProSync's confidential information and a clear abandonment of his duty of loyalty.

103.    Miller's breach did not end with his employment. Less than two weeks after leaving ProSync, and squarely within his post-employment restricted period, Miller was actively engaged

17

in business-development discussions on behalf of a competitor related to the same Business Opportunities he pursued at ProSync; specifically the IPSS opportunity.

104.    The ORBIS's February 18 email chain to Miller evidences Miller's exploitation of relationships and information developed through his role at ProSync to benefit a competitor.

105.    As described above, Miller leveraged ProSync's confidential information and relationships with ProSync's customers and subcontractors for his own personal gain and for the gain of his new employer, ODME.

106.    ProSync has suffered cognizable harm as a direct result of Miller's breach.

107.    Miller's disloyal conduct undermined ProSync's active pursuit of the IPSS opportunity, damaged ProSync's relationships with customers and teaming partners, and eroded the goodwill and competitive advantage ProSync developed through substantial investment of time, resources, and trust.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, having fully complained, prays for judgment against Defendant with the following particular relief:

i.    Enjoining Miller from, for the six-month restrictive period in his Agreement tolled to begin on the date of the injunction, performing services for any business that competes with ProSync within Arizona, Pennsylvania, Maryland, Virginia, and the District of Columbia, directly or through others, including, but not limited to, ODME in any capacity substantially similar to the services Miller provided to ProSync;

ii.    Enjoining Miller from, for the six-month restrictive period in his Agreement tolled to begin on the date of the injunction, soliciting or providing competing services to

18

any current or prospective customers of ProSync with whom Miller had contact, responsibility, or access to Confidential Information during the one year preceding his separation from ProSync;

iii. Enjoining Miller from, for the six-month restrictive period in his Agreement tolled to begin on the date of the injunction, soliciting any ProSync contractor, subcontractor, or other entity with whom ProSync had a contractual business relationship with whom Miller had contact, responsibility, or access to Confidential Information during the one year preceding his separation from ProSync;

iv. Enjoining Miller from using any ProSync confidential information or trade secrets for the benefit of ODME or any person other than ProSync;

v. Requiring a forensic audit of all work and personal electronic devices in Miller's control or possession (including but not limited to emails, text messages, LinkedIn messages, and cloud-based storage accounts) for the limited purpose of identifying improper use, possession, or transmission of ProSync's confidential and proprietary information and trade secrets;

vi. Requiring Miller to account for and disclose all of ProSync's confidential information and trade secrets in his possession or which he removed from ProSync or has used or possessed since his departure from ProSync;

vii. Prohibiting Miller pending further order of this Court from either on his own account or for any person, firm, partnership, corporation, or other entity (a) soliciting, engaging, inducing, or attempting to induce any current or prospective customers of ProSync, or (b) doing business with any other person, firm, partnership, corporation, or other entity which performs services materially similar

19

to or competitive with those provided by ProSync; and

viii.    Such other relief that the Court deems just and proper in the circumstances.

Respectfully submitted,

**JACKSON LEWIS P.C.**

Dated: April 14, 2026                                  By:

John M. Remy
M.D. Bar No. 15512
Bernard G. Dennis, III
M.D. Bar No. 13903
11790 Sunrise Valley Drive, Suite 400
Reston, VA 20191
Tel.: (703) 483-8300
Email: John.Remy@jacksonlewis.com
Email: Bernard.Dennis@jacksonlewis.com
*Counsel for Plaintiff*

20