**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |
|---|---|
| PROSYNC TECHNOLOGY GROUP, LLC, | * |
| Plaintiff, | * |
| v. | *  Civil Case No.: SAG-26-1436 |
| TIM MILLER, | * |
| Defendant. | * |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**MEMORANDUM OPINION**

ProSync Technology Group, LLC ("ProSync") filed this action against its former employee, Tim Miller ("Defendant"), asserting various claims regarding his alleged misappropriation of trade secrets and confidential information along with breach of his employment agreement. ECF 1. ProSync has moved for a Preliminary Injunction, seeking to enforce the employment agreement's terms and prevent use of any of the disputed information. ECF 3. The motion is fully briefed, ECF 23, 26, 27, and this Court held an evidentiary hearing on May 20, 2026. Following the hearing, this Court requested and has reviewed briefing from ProSync and Defendant, who now appears in a self-represented capacity. ECF 32–35. For the reasons explained below, ProSync's Motion will be granted in part and denied in part.

**I.    FACTUAL BACKGROUND**

Defendant began working for ProSync in June of 2020 and was responsible for its business development division. ECF 31 at 57–58. ProSync is a Services-Disabled Veteran-Owned Small Business ("SDVOSB"), a category permitting it to compete for certain set-aside government contracts as the prime contractor. *Id.* at 72. On June 19, 2020, Defendant and ProSync entered into

an employment agreement containing non-compete and non-solicitation provisions, in addition to provisions mandating protection and return of ProSync's proprietary information ("the June Agreement"). ECF 3-2.

At the hearing, Defendant presented screenshot evidence of another agreement he signed on July 9, 2020 ("the July Agreement"). Exh. 12. That screenshot shows that the agreement, entitled "Agreement of New Employee Regarding Confidentiality, Proprietary Interests, Conflicts of Interests and Non-Solicitation of Customers and Employees," was signed by Defendant but not executed by ProSync. *Id.* ProSync has introduced evidence, via declaration, that the July Agreement is the agreement used for lower-level employees and ProSync did not countersign it, because they did not intend that agreement to apply to Defendant in his high-level management position. ECF 33-4 ¶ 4.

Defendant also provided a "term sheet" he and ProSync executed in 2022. ECF 23-2. That term sheet lists various changes to Defendant's compensation and benefits and states at the bottom "*specific terms and conditions to follow in October 2022." *Id.* Defendant adduces no evidence of other changes or amendments to the June Agreement.

During Defendant's employment, ProSync began to pursue a government contract for Integrated Product Support Services ("IPSS"). ECF 31 at 74. The contract had a small business set-aside, meaning that any designated small business could bid to be the prime contractor. *Id.* at 75. In support of ProSync's proposal, Defendant had assembled a team of two subcontractors. *Id.* at 77. One was a company named ORBIS, which does integrated product support services for the Navy and has a rare specialty called obsolescence. *Id.* at 77–78. The Teaming Agreement between ProSync and ORBIS guaranteed ORBIS between 20 and 25 percent of the total contract value if ProSync won the contract. *Id.* at 79.

In September, 2025, the president of ORBIS, Charlie Grabenstein, introduced Defendant to Mannie Humphreys, the CEO of ODME Solutions, a Woman-Owned Small Business ("WOSB"). *Id.* at 73, 165. ODME is headquartered in Florida, and Defendant had limited knowledge of it. *Id.* at 165. Initial discussions went nowhere. *Id.*

In January, 2026, after some management changes at ProSync following its acquisition of Jaguar Defense, ProSync provided Defendant with a new Employment Agreement with a significant reduction in his compensation. *Id.* at 59–60, 165–66. Shortly thereafter, Humphreys "pinged" Defendant to ask whether he might be interested in another discussion, and he flew to Florida for a meeting. *Id.* at 166. A few weeks later (around January 18 or 19), Humphreys sent Defendant an offer letter, which he signed and returned on January 22, 2026. *Id.* at 167.

That same day, Defendant used a USB drive to download the contents of his ProSync computer. *Id.* at 172. He avers that his goal was to preserve certain personal files residing on his ProSync computer in the easiest possible manner. *Id.*

Upon arrival at ODME, Defendant learned that, sometime in the previous year, ODME had responded to the IPSS "Sources Sought."[1] *Id.* at 169. Shortly after Defendant started work at ODME, ORBIS asked ProSync to be released from its Teaming Agreement relating to the IPSS project. *Id.* at 91–93. As justification, ORBIS told ProSync that it no longer wanted to subcontract and wished only to pursue contracts as the prime contractor. *Id.* ProSync agreed to release ORBIS from the Teaming Agreement, hoping to preserve a good professional relationship with ORBIS because of its unique expertise. *Id.* at 94–95. A couple of weeks later, however, ProSync obtained

---

[1] From the testimony at the hearing, it appears that an entity's participation in "Sources Sought" might impact the eventual Request for Proposal and the customer's determination about whether there should be any set-asides in the contract. For example, ODME's participation might have led to a set-aside for WOSBs.

an email, accidentally sent to Defendant's ProSync email address instead of his ODME email, attaching a proposed Teaming Agreement between ODME and ORBIS for the IPSS contract. *Id.* at 96–98. The draft agreement promised ORBIS a "minimum of 25 percent" of the contract value, a higher percentage than that ProSync had promised. *Id.* at 98.

ODME ultimately did not respond to the IPSS proposal and is not in the running to win the contract. *Id.* at 103. However, ProSync was unable to find another provider to fill the role ORBIS played as a subcontractor. *Id.* at 103–05. ProSync's response to the IPSS proposal was therefore weaker than it would have been with the ORBIS Teaming Agreement in place. *Id.* at 105. The IPSS contract has not yet been awarded. *Id.*

Additionally, Philip Dominguez worked as a consultant for ProSync supporting the IPSS opportunity. *Id.* at 100, 103. After Defendant left ProSync, Dominguez stopped responding to ProSync's employees and became employed by ODME. *Id.* at 100, 103, 150, 153.

Following Defendant's move to ODME, he continued to provide some professional assistance to ProSync employees. *Id.* at 176–79. He has also introduced evidence that his wife, who was terminated from ProSync on April 2, 2026, retained administrative privileges for ProSync's LinkedIn as of May 18, 2026. *Id.* at 179–80.

After learning of Defendant's actions with ORBIS and the IPSS opportunity, ProSync investigated and discovered Defendant's downloading of the files on his computer. Following negotiations with Defendant's then-counsel, a forensic examiner, Edward Snyder, performed an evaluation of the USB drive containing the download. *Id.* at 22–23. Snyder determined that Defendant had downloaded approximately 50 GB (just over 22,000 documents) of ProSync-related data on January 22, 2026. *Id.* at 27. The USB drive was not encrypted, password protected, or otherwise secured. *Id.* at 28. And the ProSync-related data included Controlled Unclassified

Information ("CUI"). *Id.* at 36–38. As a result of the mishandling of that data, ProSync has had to report the situation to appropriate government agencies. *Id.* at 124–25. Defendant also downloaded information relating to at least two proprietary tools, CVKeys and Rocket AI. *Id.* at 108–112. Additionally, Defendant downloaded a March 8, 2022 proposal ProSync made to the Naval Surface Warfare Center. *Id.* at 113–18. All of those items have significant economic value to ProSync and would be very valuable to a direct competitor. *Id.*

## II.  LEGAL STANDARD

A preliminary injunction is warranted when the movant demonstrates four factors: (1) that the movant is likely to succeed on the merits, (2) that the movant will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities favors preliminary relief, and (4) that injunctive relief is in the public interest. *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *Wilson v. Williams*, Civ. No. 9:19-cv-01369-RMG, 2019 WL 4942102, at *1 (D.S.C. Oct. 8, 2019). The movant must establish all four elements in order to prevail. *Pashby v. Delia*, 709 F.3d 307, 320–21 (4th Cir. 2013). Ultimately, the decision to issue a preliminary injunction is committed to the trial court's discretion. *Id.* at 319.

A preliminary injunction affords "'an extraordinary and drastic remedy' prior to trial." *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, Civ. No.: SAG-18-2315, 2019 WL 2642838, at *6 (D. Md. June 27, 2019) (quoting *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)); *see also MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (stating preliminary injunctive relief is an "extraordinary remed[y] involving the exercise of very far-reaching power [that is] to be granted only sparingly and in limited circumstances.") (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)). Since preliminary injunctions are

intended to preserve the status quo during the pendency of litigation, injunctions that "alter rather than preserve the status quo" are particularly disfavored. *Mountain Valley Pipeline, LLC v. 6.56 Acres of Land*, 915 F.3d 197, 216 n.8 (4th Cir. 2019). Courts should grant such "mandatory" preliminary injunctions only when "the applicant's right to relief [is] indisputably clear." *Id.*

## III.   ANALYSIS

### A.   Likelihood of Success on the Merits

To obtain preliminary injunctive relief, ProSync bears the burden to show that it is likely to succeed on at least one of its claims. *See, e.g.*, *Stinnie v. Holcomb*, 355 F. Supp. 3d 514, 527 (W.D. Va. 2018). To establish misappropriation of a trade secret under federal law and Maryland state law, ProSync must demonstrate that the documents at issue are trade secrets, and that Defendant misappropriated those trade secrets. *See* 18 U.S.C. §§ 1836(b)(1), 1839(3), (5); Md. Code Ann., Com. Law §§ 11-1201(c), (e), 11-1202(a). ProSync has shown a likelihood of success on both elements.

First, ProSync has shown a likelihood of success in establishing that at least some of the documents at issue are trade secrets. "[A]ll forms and types of financial, business, scientific, technical, economic, or engineering information," regardless of whether it is tangible or intangible, or how the information is stored, memorialized, or maintained, can qualify for protection as a "trade secret" under the federal Defend Trade Secrets Act ("DTSA"). 18 U.S.C. § 1839(3). However, such information only becomes a trade secret if (1) the owner of the trade secret takes "reasonable measures to keep such information secret," and (2) the information "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* § 1839(3)(A)–(B).

Similarly, the Maryland Uniform Trade Secrets Act ("MUTSA") defines a "[t]rade secret" as any information that the owner "[d]erives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use," and takes reasonable efforts to maintain its secrecy. Md. Code Ann., Com. Law § 11-1201(e). To determine whether information is a trade secret, Maryland courts assess: (1) the extent to which the information is known outside of plaintiff's business; (2) the extent to which it is known by employees and others involved in plaintiff's business; (3) the extent of measures taken by plaintiff to guard the secrecy of the information; (4) the value of the information to plaintiff and competitors; (5) the amount, effort, or money expended by plaintiff in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated by others. *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 95 (4th Cir. 2018) (citing *Restatement (First) of Torts* § 757 cmt. b); *see also Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, Civ. No.: SAG-18-2315, 2019 WL 2233535, at \*17 (D. Md. May 23, 2019) (quoting *Allan M. Dworkin, D.D.S., P.A. v. Blumenthal*, 77 Md. App. 774, 781–82 (1989)).

As relevant here, the Defend Trade Secrets Act provides that a trade secret can be misappropriated when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, *id.* § 1839(5)(B)(i). Maryland defines misappropriation in "substantially the same manner." *Md. Physician's Edge, LLC v. Behram*, No. DKC-17-2756, 2019 WL 4573417, at \*5 (D. Md. Sept. 20, 2019). *Compare* Md. Code Ann., Com. Law § 11-1201(c) *with* 18 U.S.C. § 1839(5). Thus, a claim for misappropriation lies "simply by demonstrating that the defendant acquired [the] trade secret by

7

improper means, even if the plaintiff cannot show use of that trade secret." *Sys. 4, Inc. v. Landis & Gyr, Inc.*, 8 F. App'x 196, 200 (4th Cir. 2001) (interpreting the MUTSA). The DTSA further provides that the "improper means" of acquiring a trade secret "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." 18 U.S.C. § 1839(6)(A). The MUTSA's definition mirrors the DTSA's definition. *Compare id. with* Md. Code Ann., Com. Law § 11-1201(b).

The information Defendant downloaded and retained includes ProSync's marketing plans, business projections, product information and specifications, government debriefs, and confidential personnel information. ECF 31 at 108–120, 126. As described at the hearing, ProSync operates in the highly competitive realm of government contracting, and this information is only shared privately with potential customers in the bidding process. Because of the volume of records downloaded, ProSync did not identify with great specificity all of the trade secrets it alleges to be misappropriated. But at least some of the records relate to ProSync's proprietary inventions, such as CVKeys or Rocket AI, that have substantial economic value to ProSync, are not shared publicly, and would be valuable to its competitors. This information conveys a competitive advantage to ProSync and would do the same for another company competing for some of the same government contracts. *Id.* at 116-18. The evidence at the hearing indicates that ProSync required its senior executives to sign agreements to guard the confidentiality of such information and limited access to many of those materials to a need-to-know basis.[2] ProSync has therefore established that, at

---

[2] ProSync provided some testimony about its office security measures, but little concrete information about its computer security measures. ECF 31 at 63–64. ProSync's witness could not even specify what security measures protected Defendant's work laptop (which, Defendant submits, was also his personal computer). *Id.* at 14, 63–64. This Court therefore does not rely on ProSync's computer security measures in analyzing its protection efforts. But it is not persuaded that insufficient computer security jeopardized the information, either.

least as to those proprietary programs, the information in question derives independent economic value from not being publicly known and that it took reasonable measures to keep the information contained within the company and secret from the public.

Defendant contests whether he "misappropriated" the trade secrets, arguing that he simply downloaded the contents of his work drive in an effort to "save time" in transferring his personal items he had saved on his work computer. He tries to bolster that argument by showing that, on several occasions after his departure, he maintained a degree of loyalty to the company and even assisted ProSync employees with job tasks. But, in this context, "misappropriation" does not require malevolent intent. The June Employment Agreement prohibited Defendant from taking "Proprietary Information" when he left the company. *Id.* at 142–143. And misappropriation lies "simply by demonstrating that the defendant acquired [the] trade secret by improper means." *Sys. 4, Inc.*, 8 F. App'x at 200. There is no dispute here that, whatever his motivation, Defendant downloaded vast amounts of ProSync's information onto a USB drive and took it with him when he ended his employment. ProSync has established a likelihood of success that it can prove misappropriation of trade secrets and, by the same token, breach of the provisions of the Employment Agreement regarding return of company property.

ProSync also has established a likelihood of success on the merits as to its claims pertaining to breach of the non-competition and non-solicitation provisions of Defendant's June 2020 Employment Agreement. The evidence at the hearing established that both parties executed the June Agreement. Defendant also introduced evidence, in the form of screenshots, that he signed a separate "Agreement of New Employee Regarding Confidentiality, Proprietary Interests, Conflicts of Interests and Non-Solicitation of Customers and Employees" three weeks later, on July 9, 2020. Exh. 12. But the screenshot exhibit did not show that ProSync ever executed the July Agreement,

and ProSync has provided evidence that it did not. ECF 33-4. Thus, the evidence before this Court indicates a likelihood that the June Agreement remains operative and its provisions control.

In response to the non-compete allegations, Defendant contends, in his briefing and at the hearing, that ODME is not a direct competitor of ProSync. He alleges that ODME is a WOSB, not a SDVOSB like ProSync, and that ODME focuses on engineering services while ProSync's specialty is security and intelligence services. ECF 23 at 2. Those distinctions may prove accurate. But Defendant's contention that the companies are not direct competitors is undermined by the fact that, at least as to the IPSS bid around the time of Defendant's departure, ODME and ProSync participated in the initial stages to pursue the contract, both seeking exclusive use of ORBIS's expertise to bolster their proposals. Both are able to compete for contracts designated for Small Businesses or contracts that are full and open. While there are some distinctions, then, there is a likelihood based on the evidence presently before this Court that ProSync will succeed on the merits of its claim that ODME, at least in part, is a Restricted Business operating in the Restricted Area as defined by the June Agreement.

Further, ProSync offers some evidence that Defendant himself engaged in directly competitive activity. Specifically, Defendant's personal involvement in the proposed teaming arrangement between ORBIS and ODME on the IPSS opportunity suggests direct competition, not simply having been hired at a company that, unbeknownst to Defendant, previously participated in the early stages of the same contracting process.

This Court concludes, then, that ProSync has met its burden to establish a likelihood of success on the merits of its trade secrets and breach of contract claims, even in the context of the mandatory injunction it requests.

10

### B. Irreparable Harm

Generally, "irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *Coreas v. Bounds*, 451 F. Supp. 3d 407, 428 (D. Md. 2020) (quoting *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994), *abrogated on other grounds by Winter*, 555 U.S. 7). Moreover, issuing a preliminary injunction "based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a 'clear showing' that the plaintiff is entitled to relief." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Winter*, 555 U.S. at 22).

Conversely, "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Multi-Channel TV Cable Co.*, 22 F.3d at 552. As this Court has recognized, once trade secrets are used by a competitor, the competitive advantage is permanently lost. *See Brightview Grp., LP v. Teeters*, 441 F. Supp. 3d 115, 141 (D. Md. 2020). Nevertheless, the Maryland Court of Appeals has denounced the issuance of injunctions under the "inevitable disclosure" theory of irreparable harm. *See LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 322-23 (2004). That is, ProSync cannot obtain injunctive relief under the MUTSA merely because, by the nature of working in a competing venture, Defendant will "inevitably be required to use or disclose [ProSync's] trade secrets in order to perform [his] new job." *Id.* at 317 (citation omitted).

Here, the evidentiary record supports a finding of irreparable injury. ProSync has already suffered impact to its IPSS bid from what appears to be competitive activity by Defendant in working with ORBIS at ODME. Defendant's retention of and ability to access ProSync's trade secrets and confidential information create the possibility of permanent loss of competitive

advantage and contracts to ODME. Moreover, his retention of CUI and other protected government information that had been in ProSync's custody creates the likely loss of goodwill with its government customers. Thus, absent preliminary injunctive relief, ProSync will suffer irreparable injury.

### C. Balance of the Equities and Public Interest

The final two factors for issuing preliminary injunctive relief also weigh in ProSync's favor. First, the balance of the equities favors ProSync. ProSync faces the prospect of suffering irreparable harm through the continued disclosure of its trade secrets, through Defendant's possession of information its government clients deemed "CUI," and through Defendant's wrongful utilization of ProSync's confidential and proprietary information to bolster the business of his new employer, which heavily favors injunctive relief. *See, e.g.*, *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 708 (E.D. Va. 2012) ("[T]he continued use of a purloined trade secret is a harm of significant measure that warrants injunctive relief."), *vacated on other grounds*, 564 F. App'x 710, 715 (4th Cir. 2014) (remanding for a new trial due to an erroneous ruling on a pretrial motion in limine).

Defendant, meanwhile, has produced no evidence of any harm that he will suffer if the Court enjoins him from maintaining or using ProSync's information during the pendency of the litigation. If Defendant truly has no intent to use ProSync trade secret or proprietary information to compete going forward (as he insists), then enjoining his further use of that information (or requiring, in some instances, its return or deletion) will not cause him any harm. The balance of the equities, then, lies with ProSync.

Finally, the public interest favors the protection of trade secrets, and the prevention of unfair business practices. *See NaturaLawn of Am., Inc. v. West Grp., LLC*, 484 F. Supp. 2d 392,

404 (D. Md. 2007) (noting that it is in the public interest "to validate . . . the proprietary nature of trade secrets"). While the public certainly has an interest in promoting free market competition in a capitalist economy, that interest is not protected unless the legal system "prevent[s] unethical business behavior" and stops market participants from driving "another competitor out of business by unfairly misappropriating trade secrets" and other confidential business information. *See Advanced Instructional Sys., Inc. v. Competentum USA, Ltd.*, No. 1:15CV858, 2015 WL 7575925, at *6 (M.D.N.C. Nov. 25, 2015) (citations omitted); *see also GAI Audio of N.Y., Inc. v. Columbia Broad. Sys., Inc.*, 27 Md. App. 172, 192 (1975).

In sum, ProSync has demonstrated a likelihood of success in establishing that Defendant has violated the Defend Trade Secrets Act and the Maryland Uniform Trade Secrets Act, in addition to the competition, solicitation, and return of property provisions of his June Agreement. ProSync has also demonstrated that it is likely to suffer immediate, irreparable harm without preliminary injunctive relief. Because the balance of the equities favors ProSync, and issuing a preliminary injunction is in the public interest, the Court will grant ProSync's request for a preliminary injunction.

### D. Scope of Relief Ordered

Finally, this Court must analyze the scope of the relief ProSync requests. ProSync's proposed order, ECF 33-5, contains six substantive paragraphs. Paragraph one seeks to prohibit Defendant, until October 17, 2026[3], from taking any action to participate in sixteen particular business opportunities. The first ten of the listed business opportunities were part of the January

---

[3] The parties agreed to a temporary injunction on April 17, 2026, which has been in effect since. The October 17, 2026 date represents the six-month window prescribed in the June Agreement. Of course, as this is a preliminary injunction, should this litigation conclude sooner or other circumstances warrant, the date is subject to revision.

2026 PowerUp slides prepared by Defendant for discussion at ProSync. *See* ProSync Hrg. Exh. 5. Thus, it is within the scope of the non-competition clause to prohibit Defendant from work on those opportunities, which constitute Restricted Business. This Court cannot find any evidence in the record relating to the other six opportunities and therefore declines to include them specifically in the preliminary injunction order. Of course, if Defendant's involvement in those opportunities would be barred by the Non-Competition clause, he cannot engage in the activity under the June Agreement.

The second paragraph largely tracks the language of the non-competition clause in the June Agreement, prohibiting Defendant, until October 17, 2026, from performing certain services for any business that competes with ProSync within Arizona, Pennsylvania, Maryland, Virginia, and the District of Columbia. This Court will amend the language to make clear that Defendant is not prohibited from employment at ODME, but the services he provides must be unrelated to the Restricted Business ProSync performs. *See* ECF 3-2 ¶ 8 (permitting employment with a company engaged in the Restricted Business "where the Employee's service for such company does not relate to the Restricted Business.")

The third paragraph again prohibits Defendant, until October 17, 2026, from soliciting or providing competing services to any current customers of ProSync (as defined in the order) or any persons for whom ProSync had taken specific action to prepare or submit a proposal within six months of Defendant's separation. This Court will align the language with that in the June Agreement by making it read "within six months preceding Defendant's separation from ProSync."

This Court will order the fourth paragraph as written, which states "Defendant shall not, directly or indirectly, retain, access, disclose, transmit, share, use, or otherwise exploit for his own

benefit or for the benefit of any third party any proprietary, confidential, or trade secret information belonging to ProSync, including but not limited to the information that Defendant copied to a drive on January 22, 2026."

The fifth and sixth paragraphs relate to the proposed effectuation of paragraph four, but this Court will limit the relief requested in certain ways. First, with respect to the Macintosh computer and the sons' personal computers, Mr. Snyder's initial review should be limited to ascertaining whether the USB drive was ever plugged in to those devices. If not, the inspection should cease, and those computers should be returned to Defendant. Second, with respect to the HP personal computer (and any other computer in which the USB drive was inserted), this Court is concerned about allowing Mr. Snyder to search for and remove "all ProSync-related information" from the device. Defendant worked for ProSync for several years and is likely to have resumes and other legitimate documentation relating to ProSync that is not proprietary or confidential. His spouse, who also shares the computer, also worked for ProSync. And Defendant is presently self-represented in this Court and will presumably have ProSync-related information concerning his defense.

With the exception of a few identified items, ProSync has not provided this Court with a comprehensive list of trade secret or other proprietary information that this Court could readily order returned to avoid the overbreadth issue described above. And this Court is unwilling to delegate to Mr. Snyder the duty of determining what information is a trade secret or proprietary to ProSync. This Court believes, therefore, that its preliminary injunction barring Defendant's accessing or using ProSync's information, in addition to its enforcement of the provisions of the June Agreement, will largely protect ProSync's interest. However, from the hearing, it is clear that two categories of information must be removed completely from Defendant's possession – (1) any

Controlled Unclassified Information ("CUI") or Unclassified/For Official Use Only ("U/FOUO") information Defendant copied from ProSync and (2) information relating to CVKeys or Rocket AI, along with the March 8, 2022 proposal for the Naval Surface Warfare Center. Accordingly, this Court will permit inspection of the HP by Mr. Snyder for two specific purposes: (1) locating and removing any CUI or U/FOUO information copied from ProSync's devices or network, and information relating to CVKeys, Rocket AI, or the March 8 proposal, and (2) documenting the last access dates, date of transfer to the computer, and any attempt at deletion for other information from the USB drive now residing on the computers. This Court will also require that Mr. Snyder's examination, which will temporarily deprive Defendant and his spouse of their computer, take no more than seven (7) days.[4]

## IV.    CONCLUSION

For the reasons set forth above, ProSync's Motion for Preliminary Injunction, ECF 3, is GRANTED IN PART AND DENIED IN PART, in that this Court will alter the requested relief in the manner described herein. A separate Order follows.


Dated: June 4, 2026                                              /s/
                                                       Stephanie A. Gallagher
                                                        United States District Judge

---

[4] It remains unclear to this Court where the original USB drive is located and whether it still contains all of the files Defendant removed from ProSync. This Court's understanding, from the hearing, is that ProSync had reached agreement with Defendant's former counsel to leave the files on the thumb drive in case there was a litigation-related reason they were needed. Now that Defendant is self-represented, the parties may need to reach agreement on a new proposal to ensure the security of the information while preserving the record for the case.

16